The BERRY–IVERSON CO. OF NORTH DAKOTA, INC., a corporation, Plaintiff-Appellee,

v.

Robert J. JOHNSON et al., Defendants-Appellees,

and

Virgil Locken and David Locken, Defendants-Appellants.

Civ. No. 9182.

Supreme Court of North Dakota.

May 12, 1976.
Rehearing Denied June 10, 1976.

Lester J. Trnka, Oakes, for Virgil and David Locken, defendants and appellants.

Tenneson, Serkland, Lundberg & Erickson, Ltd., Fargo, for defendants and appellees, Robert J. Johnson, Wanda C. Johnson, and Ardys N. Sand; argued by Jack G. Marcil, Fargo.

MacKenzie & Jungroth, Jamestown, for plaintiff and appellee; argued by James R. Jungroth, Jamestown.

PAULSON, Justice.

This is an appeal by the defendants, Virgil Locken and David Locken [hereinafter the Lockens], from a judgment which compelled specific performance by the defendants to convey a four-acre radio transmitter tower site to the plaintiff, The Berry-Iverson Company of North Dakota, Inc., a corporation [hereinafter Berry-Iverson], which tract is located in Dickey County, North Dakota. The defendants, Robert J. Johnson, Wanda C. Johnson, and Ardys N. Sand, predecessors in interest to the Lockens, have not separately appealed from the judgment, although they did appear on this appeal and, in general, support the positions advanced by the Lockens.

The tract which is the subject matter of this action is a four-acre parcel of land contained in a farm consisting of approximately 390.43 acres of land, located about one mile south of the City of Oakes, in Dickey County. Berry-Iverson, which owns and operates radio station KDDR in Oakes, uses the four-acre tract as the site for its radio transmitter tower.

On June 11, 1959, Robert J. Johnson and Wanda C. Johnson (two of the defendants

in this action), owners of the 390.43-acre farm, entered into a lease agreement with Interstate Broadcasting Corporation for the four-acre tract of land on which the radio transmitter tower is situated. Such lease is for a 20-year term, expiring on May 31, 1979. The rental fee was set at $10 per month. The lease expressly states that all the provisions thereof, including the "option to purchase" clause, were to:

". . . inure to the benefit of and be binding upon the heirs and assigns of the owners to the same extent as it inures to the benefit of and is binding upon the owners themselves and that it inures to the benefit of and is binding upon the successors and assigns of the lessee to the same extent that it inures to the benefit of and is binding upon the lessee itself."

Finally, the "option to purchase" clause in the lease agreement states:

"IT IS FURTHER AGREED as a part of the consideration of this lease that the lessee is hereby given during any and all time that this lease is in full force and effect and is not in default, the sole and exclusive right and option to purchase said premises at any time the owners desire to and are willing and able to sell the same for such price and on such terms that said owners are then and there able to obtain and are willing to accept from a bonafide purchaser."

Such lease agreement was duly filed for record in the office of the Dickey County Register of Deeds on October 19, 1965, at 3:00 p. m., and recorded in Book C–1 of Miscellaneous, at page 479.

On June 30, 1964, Interstate Broadcasting Company assigned its interest in such lease to Farm States Radio Company of Mobridge, South Dakota. On December 31, 1972, Farm States Radio Company assigned its interest in the lease to the plaintiff herein, Berry-Iverson, which now owns and operates such radio station in Oakes.

The 390.43-acre farm, of which four acres is the tract in question, was owned by Albert T. Johnson and Hilma Johnson, his wife. On March 26, 1951, by warranty deed, they transferred title to the farm to Robert James Johnson and Wanda C. Johnson, his wife. Wanda is the daughter of Albert T. and Hilma Johnson. On August 29, 1961, Robert J. Johnson and Wanda C. Johnson, husband and wife, by quit claim deed, reconveyed title to the farm to Albert T. Johnson. Three years later, on August 31, 1964, by quit claim deed, Albert T. Johnson and Hilma A. Johnson, husband and wife, conveyed the farm to Wanda C. Johnson and Ardys N. Sand. Ardys is also a daughter of Albert T. and Hilma Johnson. On February 22, 1973, Wanda C. Johnson and Ardys N. Sand entered into a contract for deed with the Lockens for the sale of the entire 390.43 acres of land, including the four-acre tract under lease to Berry-Iverson pursuant to the assignment of the lease originally entered into between Interstate Broadcasting Company and the Johnsons in 1959. Berry-Iverson thereafter commenced suit, contending that the defendants breached the terms of the 1959 lease agreement by conveying the property to the Lockens without first permitting Berry-Iverson to exercise its option to purchase; and also requesting punitive damages. The district court dismissed Berry-Iverson's claim for punitive damages (from which dismissal Berry-Iverson did not cross-appeal), but the court concluded that all of the defendants had breached a valid option to purchase contained in the 1959 lease agreement, and ordered that Berry-Iverson be permitted to exercise such option at the price of $149.84 per acre, if it so desired; and further ordered that, if Berry-Iverson tendered such purchase price, title to the four-acre tract be conveyed to it. From such judgment the Lockens appeal.

The Lockens present four issues for our review in this appeal:

1. Did the trial court err in concluding that the "option to purchase" clause contained in the lease agreement was valid?

2. Is the twenty-year term of the lease agreement a violation of § 47–16–02, N.D.C.C., which prohibits leasing of agricultural land for more than ten years?

3. Did the trial court err in granting specific performance as the appropriate remedy in this case?

4. Did the trial court err in concluding that Berry-Iverson should be permitted to purchase the four-acre tract at a price of $149.84 per acre?

■ Findings of fact by the district court, in a case tried upon the facts without a jury, will not be set aside by this Court unless they are clearly erroneous. Rule 52(a), N.D.R.Civ.P.; *Eakman v. Robb,* Syll. ¶ 2, 237 N.W.2d 423 (N.D.1975); *Kleinjan v. Knutson,* 207 N.W.2d 247 (N.D.1973). Furthermore, in *Eakman v. Robb, supra* 237 N.W.2d at 424, in paragraphs 4 and 5 of the syllabus, we held:

"4. A finding is 'clearly erroneous' only when, although there is some evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. The mere fact that the appellate court might have viewed the facts differently, if it had been the initial trier of the case, does not entitle it to reverse the lower court.

"5. Questions of fact decided by the trial court upon conflicting evidence are not subject to reexamination by the Supreme Court."

The Lockens' first contention is that the "option to purchase clause" contained in the lease agreement is neither definite nor certain enough to permit the courts to enforce it. The lease agreement provides that the lessee [Berry-Iverson] is given "the sole and exclusive right and option to purchase" the four-acre tract at any time that the owners [Johnson and Sand] "desire to and are willing and able to sell the same" during the term of such lease (20 years). Furthermore, the lessee [Berry-Iverson] may effect purchase of the four-acre tract "for such price and on such terms" that the owners [Johnson and Sand] are "then and there able to obtain and willing to accept from a bonafide purchaser".

■ In *Hughes Realty Company v. Breitbach,* 98 N.W.2d 374 (N.D.1959), this Court, in paragraph 1 of the syllabus, held:

"1. Courts will not enforce a contract which is vague, indefinite, and uncertain, nor will they make a new contract for the parties."

In *Hughes Realty, supra,* this Court upheld an option to renew contained in a lease agreement, despite the landlord's contention that the term relating to price [rent] was too indefinite and uncertain to be enforced by the courts. This Court, in *Hughes Realty,* pointed out that there is a split of authority on the question of whether or not a renewal agreement which leaves the rental to be fixed by future agreement of the parties is unenforceable and void for uncertainty and indefiniteness. However, the Court considered it unnecessary to adopt one of the two positions, because the Court found that the rental price had been agreed upon by the parties; hence the Court concluded that the term as to price was definite and certain.

In the instant case, we conclude that the "option to purchase clause" is valid and enforceable.

The Supreme Court of Montana, in *Weintz v. Bumgarner,* 150 Mont. 306, 434 P.2d 712 (1967), was presented with a clause in a lease agreement which provided that the owner agreed to give the tenant written notice of his specific intention to sell the farm and to permit the tenant to have ten days in which "to arrange purchase of the farm." The Montana Supreme Court upheld such clause, concluding that the tenant's right to purchase was on the same terms and conditions as offered by the prospective purchaser, notwithstanding the fact that no such language appeared in the lease agreement. In reaching such conclusion, the Montana Supreme Court, in *Weintz, supra* 434 P.2d at 716–717, discussed the treatment such "option to purchase" provisions generally receive, to wit:

"In our view the provision in question confers a right of preemption or first refusal in the lessee rather than an option in the usual sense. The distinction between the two is well explained in Volume VI, American Law of Property,

§ 26.64, p. 507: 'A pre-emption differs materially from an option. An option creates in the optionee a power to compel the owner of property to sell it at a stipulated price whether or not he be willing to part with ownership. A pre-emption does not give to the pre-emptioner the power to compel an unwilling owner to sell; it merely requires the owner, when and if decides to sell, to offer the property first to the person entitled to the pre-emption, at the stipulated price. Upon receiving such an offer, the pre-emptioner may elect whether he will buy. If he elects not to buy, then the owner of the property may sell to anyone.' . .

"Whatever language is used to describe the provision in question, it is clear that the right of the lessee to purchase accrues at such time as the lessor forms a specific intention to sell the property for a definite price on definite terms. At such time as the owner forms such specific intention to sell, the provision in question ripens into a present enforceable contract right of the lessee. . . .

". . . The reasonable construction of the provision in the lease seems to us to be that when, as and if the lessor forms a specific intention to sell the land at a definite price, the lessee's right to purchase the land for that price vests, subject to his acceptance or rejection of purchase according to the terms of the lease. It is true, as argued by the heirs who appeal herein, that the parties did not spell out in the purchase provisions that the lessee's right to purchase was a right to purchase on the same terms and conditions as any other prospective purchaser. We feel, however, that this is an implied provision in the lease inasmuch as the whole provision is rendered meaningless without it and any other construction would render the provision illusory and unenforceable for lack of certainty. We will neither presume that the parties intended to insert a meaningless purchase clause in the lease nor that the language of such clause requires that construction.

.      .      .      .      .

"Performance by plaintiff according to the terms of the purchase provision was rendered impossible by the administrator and Russell Bumgarner because plaintiff was denied any information as to the proposed purchase price or the identity of the purchaser by written notice or otherwise. Under these circumstances neither the administrator nor the heirs can defeat plaintiff's rights under the purchase provision in the lease. . . ."

Although the Supreme Court of Iowa concluded, in *Myers v. Lovetinsky,* 189 N.W.2d 571 (Iowa 1971), that specific performance was not an appropriate remedy in this type of case, it nevertheless upheld the validity of an option to purchase clause which stated:

" 'It is further agreed, that if, during the term of this lease, Lessor should desire to sell the leased premises, then the lessee shall have the privilege of purchasing at the same price for which the Lessor would be willing to sell to any other person; . . .' " 189 N.W.2d at 573.

In upholding the validity of such clause, the Iowa Supreme Court, in *Myers v. Lovetinsky, supra* 189 N.W.2d at 574–575, said:

"I. *Breach of Preferential Right.* A lease clause such as the one before us is valid. If the landlord desires to sell the demised premises to a purchaser, he must give the tenant the first right to buy at the same price. Thereupon the tenant can buy at that price. 51C C.J.S. Landlord and Tenant § 88(2) at 267; 49 Am. Jur.2d Landlord & Tenant § 369 at 386; Annot., 2 A.L.R.3d 701, 703, 710.

"To pinpoint the problem in the present case, some cases which this case is not may be eliminated. This is not a case of a sale by a landlord to a purchaser of only the demised premises which the tenant has a preferential right to buy. That, as seen, is a direct violation of the tenant's preferential right and entitles him to buy the demised premises. Neither is this a case of a sale by a landlord to a purchaser of only the portion of the farm not covered by the lease. The landlord can of

course do that, for the tenant has no preferential right to buy the portion of the farm not demised. Nor is this a case of a sale by a landlord to a purchaser of the demised premises for a specified price and of the rest of the farm for a separate price. That entitles the tenant to buy the demised premises the same as if they had been sold alone by the landlord. *This is a case in which landlords sell the whole farm including the demised premises to purchasers without separately pricing the demised premises and the rest of the farm. The decisions recognize in this kind of case, apparently without exception, that the landlord breaches the tenant's preferential right by so doing. Wilson v. Brown,* 5 Cal.2d 425, 55 P.2d 485; *Maron v. Howard,* 258 Cal.App.2d 473, 66 Cal.Rptr. 70; *Aden v. Estate of Hathaway,* 162 Colo. 311, 427 P.2d 333; *Denco, Inc. v. Belk,* 97 So.2d 261 (Fla.); *Brenner v. Duncan,* 318 Mich. 1, 27 N.W.2d 320; *Guaclides v. Kruse,* 67 N.J.Super. 348, 170 A.2d 488; *New Atlantic Garden v. Atlantic Garden Realty Corp.,* 201 App.Div. 404, 194 N.Y.S. 34, aff'd mem., 237 N.Y. 540, 143 N.E. 734; *Sautkulis v. Conklin,* 1 A.D.2d 962, 150 N.Y.S.2d 356, aff'd mem., 2 N.Y.2d 919, 161 N.Y.S.2d 885, 141 N.E.2d 916; *Atlantic Refining Co. v. Wyoming Nat'l Bank,* 356 Pa. 226, 51 A.2d 719; *L. E. Wallach, Inc. v. Toll,* 381 Pa. 423, 113 A.2d 258; *American Oil Co. v. Eastern Market Co.,* 60 York Leg.Rec. 33 (Pa.Com.Pl.); *Smith v. Traxler,* 228 S.C. 418, 90 S.E.2d 482; *First Nat'l Exch. Bank of Roanoke v. Roanoke Oil Co.,* 169 Va. 99, 192 S.E. 764. We conclude, therefore, that when the landlords here sold the whole farm to the purchasers for a single price of $1,750 per acre, they breached the tenants' preferential right to buy the demised premises." [Emphasis added.]

■ We agree with and adopt the reasoning outlined by the Supreme Courts of Montana and Iowa, and conclude that the clause in question in the instant case—although styled an "option" by the language of the lease agreement—is in effect a valid provision which confers a right of preemption or first refusal in Berry-Iverson if the owners of the four-acre tract under lease to Berry-Iverson desire to sell the leased premises. *See* 49 Am.Jur.2d, Landlord & Tenant §§ 367–371. There is no question but that the language of the clause itself provides a method by which its effective date and other terms and conditions of sale may be determined. Although no specific price is set forth in the clause, it provides for a method of calculation—namely, for "such price and on such terms that said owners are then and there able to obtain and are willing to accept from a bonafide purchaser". The owners, by failing to provide Berry-Iverson with an opportunity to exercise its right of refusal with reference to the sale of the four-acre tract of land, breached their contractual agreement by selling the 390.43-acre farm containing the four-acre tract to the Lockens.

■ The Lockens' second contention is that the lease agreement is invalid, as being in violation of § 47–16–02, N.D.C.C., which provides:

47–16–02, N.D.C.C. *"Limitations on leases.*—No lease or grant of agricultural land reserving any rent or service of any kind for a longer period than ten years shall be valid. No lease or grant of any village or city lot reserving any rent or service of any kind for a longer period than ninety-nine years shall be valid."

We believe that such contention of the Lockens is wholly without merit. The statutory prohibition restricts the lease of agricultural lands to a period of ten years. The land in the instant case, however, was not leased for agricultural purposes. Rather, the predecessors in interest to Berry-Iverson specifically leased the four-acre tract of land for use as a site for a radio transmitter tower and associated equipment, including the subsurface placement of a network of wires. The evidence is uncontradicted that the use of the entire site for such purpose continues. The Supreme Court of South Dakota, in *Ryan v. Sioux Gun Club,* 68 S.D. 345, 2 N.W.2d 681 (1942), considered a statutory prohibition similar to the restriction

placed upon a lease of agricultural land by § 47–16–02, N.D.C.C., and concluded that such prohibition did not apply to land leased for use as a gun club. After reviewing the historical interpretation placed upon similar provisions in other jurisdictions, the South Dakota Supreme Court concluded in *Ryan, supra* 2 N.W.2d at 683:

"The lease with which we are here concerned expressly provides the purposes for which the property is leased, and by these express terms 'agricultural purposes' are excluded. It might well be that under the evidence submitted the leased land was agricultural land, in the broad conception of that term, but this fact is not decisive. We believe the reasoning of the New York, Montana, and Michigan courts is sound, and that the statute should be construed so as not to apply to leases of land even though suitable for agriculture, when leased for a purpose other than agriculture, and exclusive of the right of agriculture."

We likewise find no merit in the Lockens' contention that, irrespective of the purpose for which the land was leased, the tenants used the land for agricultural purposes. The district court, in its Finding of Fact Number 7, stated:

"7.

"That the leased property was not intended to be used and was never used for agricultural purposes during the period of the lease referred to as Plaintiff's Exhibit 1 herein but instead was used as a transmitter site for a radio station and therefore does not fall within the prohibition of § 47–16–02 of the North Dakota Century Code."

We have reviewed the evidence and conclude therefrom that such finding is not clearly erroneous. Any grass that was cut from the four-acre tract for use as hay was done incidental to its primary use as a transmitter tower site, and was done only to properly maintain the premises for such use. The evidence that some cattle may have grazed on the four acres in question at some point in time is not enough for this Court to say that the district court's Finding of Fact Number 7 is clearly erroneous.

We therefore conclude that the lease agreement in the instant case does not violate § 47–16–02, N.D.C.C.

The Lockens' third contention is that the district court erred in granting Berry-Iverson's request for specific performance as to the four-acre tract of land which it leased from Johnson and Sand for use as a radio transmitter tower site. The Lockens refer us to cases which appear to support their contention that specific performance is not a proper remedy in a situation where the owner of a larger parcel of land, which parcel includes a smaller tract under lease to another, sells such larger parcel without separately determining the value of that portion of the entire parcel which is subject to the leasehold right of the tenant. A number of the cases cited to us by the Lockens are contained in an Annotation entitled: "Lessee's Option to Purchase as Affected by Lessor's Receipt of Offer for, or Sale of, Larger Tract which Includes the Leased Parcel", reported at 170 A.L.R. 1068. In addition, counsel for Johnson and Sand argue that the appropriate remedy, if any, in the instant case, is a preservation of the status quo by enjoining Johnson and Sand from selling the four-acre tract until the expiration of the lease on May 31, 1979; and refer us to *Myers v. Lovetinsky,* 189 N.W.2d 571 (Iowa 1971), and cases cited therein, as authority for such position.

We have carefully examined the cases referred to us by all of the defendants, as well as additional cases involving similar factual situations, and find that, in the majority of jurisdictions which have considered the question, the courts have concluded that specific performance is not an appropriate remedy in situations such as are presented in the instant case. The following cases are representative of such a viewpoint: *Myers v. Lovetinsky, supra; Guaclides v. Kruse,* 67 N.J.Super. 348, 170 A.2d 488 (1961); Annot. 170 A.L.R. 1068 (and cases cited therein). Such conclusion appears to be premised on the theory that the owner's intention to sell the larger par-

cel of land is not evidence of an intention to sell the smaller, leased parcel, at least where no separate value is placed on the smaller tract of land included in the sale of the larger parcel.

There is, however, another viewpoint. The Supreme Courts of California and Michigan hold that specific performance is an available remedy in situations where the owner has breached a tenant's preferential right to purchase the leased premises. In *Wilson v. Brown,* 5 Cal.2d 425, 55 P.2d 485 (1936), the California Supreme Court ordered specific performance in favor of the tenant where the agreement stated that "in case of sale, preference to purchase . . . shall be give[n] . . . lessees". In *Wilson, supra,* the owner of the leased premises failed to notify the tenants that the parcel of land, which included the tract under lease to the tenant, was being offered for sale.

In *Brenner v. Duncan,* 318 Mich. 1, 27 N.W.2d 320 (1947), the Supreme Court of Michigan also concluded that specific performance was an appropriate remedy where an owner, as part of the sale of a larger tract of land, sells the premises under lease to the tenant. In *Brenner, supra,* the owner sold a 100-foot parcel of land for $15,000. Included in such parcel was a 75-foot tract under lease to the tenants, which lease also provided, 27 N.W.2d at 321:

"That in the event the land is to be sold, the tenant will be given first preference and allowed to purchase said land if the parties can agree on the price."

The Michigan Supreme Court upheld such clause, stating in *Brenner, supra* 27 N.W.2d at 322:

"The terms of the lease imposed upon Helen E. Randall a duty, before selling to the defendants Powers, to fix a specific sum as the amount at which she was willing to sell the premises in question and to afford the plaintiffs an opportunity to buy the same at such figure. Her failure to do so constituted a breach of contract, making acceptance of the option by plaintiffs impossible. This situation, resulting from her own breach, may not be relied upon as a defense to plaintiffs' suit.

"Defendant Randall must be deemed to have sold the seventy-five foot parcel for a sum bearing such ratio to $15,000 as the value of said parcel bears to the value of the entire one hundred foot parcel. Plaintiffs are entitled to purchase the seventy-five feet for such figure, if they so desire."

In *Maron v. Howard,* 258 Cal.App.2d 473, 66 Cal.Rptr. 70 (1968), the California Court of Appeal, Second District, Division 3, applied the position adopted by the California Supreme Court in *Wilson v. Brown, supra,* to a case where the owner of a 16-lot parcel of land sold all 16 lots to another purchaser without giving the tenant (who leased two of the 16 lots) an opportunity to purchase the two lots which the tenant had leased from the owner on the same terms and conditions as the larger parcel was sold to the purchaser. The California Court of Appeal, in concluding that the tenant was entitled to specific performance, found that both the owner and the purchaser were fully aware of the tenant's preferential right to purchase. The California Court of Appeal stated, in *Maron, supra* 66 Cal.Rptr. at 78:

"Recognizing plaintiff's [tenant's] rights under the agreement, Howard [owner] and Smith [purchaser] could have allocated a portion of the total purchase price to the Maron [tenant's] parcel and thus have given the plaintiff a clear opportunity to have exercised his right. This they did not do. *Instead, Howard and Smith, with full knowledge of plaintiff's rights, set about to effect a sale and purchase of the property in such manner as to destroy the right of the plaintiff to make his offer to purchase on the same terms and conditions as were contained in the offer from Smith to Howard."* [Emphasis added.]

We conclude that the approach adopted by the courts in Michigan and California is more consistent with the intention of the parties at the time that they entered into the lease agreement in the instant case. Furthermore, the evidence clearly shows

that both the owners of the land in question and the purchasers thereof were aware of the use being made of the four-acre tract by Berry-Iverson. The lease agreement had been properly recorded, therefore serving as constructive notice to any prospective purchaser that Berry-Iverson had an interest in the tract in question. The evidence also shows that the Lockens, as purchasers, were aware of the location of the transmitter tower and of the fact that it was situated on land which they sought to purchase. As in *Maron v. Howard, supra,* both owners and purchasers in the instant case acted in such a manner as to interfere with Berry-Iverson's leasehold interest, with full knowledge, either actual or constructive, that such an interest existed.

Among the general equitable principles which bear on the determination of this case are the following provisions contained in § 31–11–05, N.D.C.C., in subsections 14, 20, and 32 thereof:

> *"Maxims of jurisprudence—How to be used and applied—List.—*The maxims of jurisprudence set forth in this section are not intended to qualify any of the provisions of the laws of this state, but to aid in their just application:
>
> . . . . .
>
> "14. For every wrong there is a remedy;
>
> . . . . .
>
> "20. That which ought to have been done is to be regarded as done in favor of him to whom and against him for whom performance is due;
>
> . . . . .
>
> "32. An interpretation which gives effect is preferred to one which makes void;"

As applied to the instant case, we believe that when Johnson and Sand decided to sell their 390.43-acre parcel of land, which parcel included the four-acre tract of land under lease to Berry-Iverson, the owners should have made certain that Berry-Iverson was provided with an opportunity to purchase the four-acre tract before such sale was made to the Lockens. The evidence is clear that the owners not only failed to provide such an opportunity to Berry-Iverson, but, instead, professed no interest in selling the land, while at the same time they offered such tract for sale to the Lockens.

In concluding that specific performance is an appropriate remedy in cases of this nature, we expressly reject the theory upon which *Myers v. Lovetinsky, supra* (and similar cases) is based. Instead, we conclude that an intention to sell a larger parcel of land, including a tract under lease to a tenant, is evidence of an intention to sell the leased premises, even where no separate apportionment of value is made by owner and purchaser. To conclude otherwise would permit an owner and prospective purchaser to, in effect, destroy a bargained-for purchase preemption before the expiration of the term for which such preemption was obtained.

Having concluded that the district court did not err in awarding specific performance in the instant case, we must determine the fourth issue raised by the Lockens on this appeal—Did the district court err in ordering that Berry-Iverson be given an opportunity to purchase the four-acre tract of land at a price of $149.84 per acre?

The "option to purchase clause" in the lease agreement provides that—if Berry-Iverson exercised their option to purchase the land at the time when the owners (Johnson and Sand) desired to sell it—Berry-Iverson was entitled to purchase the four-acre tract "for such price and on such terms that said owners are then and there able to obtain and willing to accept from a bonafide purchaser". The district court, in construing such language, held that Berry-Iverson was entitled to purchase the four-acre tract "for the same price as the owners obtained from the other party", and, in Finding of Fact Number 6, the court found that such amount was $149.84 per acre.

The Lockens contend that the trial court erred in determining that Berry-Iverson was entitled to purchase the four-acre tract at a price of $149.84 per acre, because they

assert that even though this Court concludes that specific performance is an appropriate remedy in a case of this nature, the proper measure of the price is the fair market value of the land at the time of the sale. The California courts have concluded, in *Wilson v. Brown, supra,* and in *Maron v. Howard, supra,* that—where the owner of leased premises, by selling such land to a third party without complying with the terms of the preferential purchase clause, makes it impossible for the price to be determined by reference to the transaction itself—a court of equity may order specific performance at the fair market value of the leased premises. The Supreme Court of Michigan, in *Brenner v. Duncan, supra* 27 N.W.2d at 322, in a specific performance suit in which the lease contained an option to purchase clause, held that the tenant was entitled to purchase the leased premises:

". . . for a sum bearing such ratio to $15,000 [selling price of the entire parcel] as the value of said parcel [leased to tenant] bears to the value of the entire one hundred foot parcel. Plaintiffs are entitled to purchase the seventy-five feet for such figure, if they so desire."

The factual situation presented in the instant case is not identical to the situation presented to the California and Michigan courts. The language of the clause in question in this case sets the price which the tenant must pay as the price that Johnson and Sand, as owners of the four-acre tract, were willing to accept from a bona fide purchaser. While it is true that no separate valuation was placed upon the four-acre tract under lease to Berry-Iverson while the Lockens were negotiating their purchase of the 390.43-acre farm from Johnson and Sand, there is no question but that the Lockens were "bona fide purchasers" of the four-acre tract of land, as that term is used in the "option to purchase" clause in the lease. The Lockens' offer of $58,000 was accepted by Johnson and Sand. Such amount, on a pro rata apportionment basis is $149.84 per acre.

In general, we would agree with the courts which have concluded that a pro rata apportionment of the purchase price to the smaller tract which a tenant seeks to purchase is not a proper measure of the purchase price of the smaller tract. Such apportionment does not consider the uses nor the value which others might attach to the smaller tract of land. However, that does not mean that, in the instant case, the district court erred in ordering specific performance at a price of $149.84 per acre.

Evidence was introduced at the trial which indicated that the four-acre tract in question was valued at anywhere from $75 per acre to $3,000 per acre. In addition, the district court had before it the contract for deed entered into by the Lockens and Johnson and Sand, which contract for deed is evidence that, overall, Johnson and Sand accepted $149.84 per acre for the land in question. There was no other evidence which would provide the court with information on what Johnson and Sand, as owners of the premises, "were willing to accept" for the four-acre tract under lease to Berry-Iverson.

The Lockens were bona fide purchasers of the entire farm, including the four-acre tract under lease to Berry-Iverson, at a total price of $58,000. Although Berry-Iverson was deprived of its preferential right to purchase the four-acre tract before Johnson and Sand sold the farm to the Lockens, Berry-Iverson is still entitled to purchase the leased premises on the same terms and conditions which Johnson and Sand were willing to accept for sale of the land at the time that the farm was sold to the Lockens. Determining the price to be paid by Berry-Iverson by reference to the fair market value of the four-acre tract, separate and apart from the particular transaction in which the owners breached their contractual agreement with Berry-Iverson, would not provide Berry-Iverson with an opportunity to purchase the four acres on the same terms and conditions at which Johnson and Sand were willing to sell to the Lockens.

In order to prevent the unjust enrichment of any party, Berry-Iverson should be permitted the opportunity to purchase the four-acre tract for the same price at which

Johnson and Sand were willing to sell such land to the Lockens. In the instant case, the only evidence bearing on the question of what Johnson and Sand, as owners, were "willing to accept" is the evidence that a pro rata apportionment of the contract for deed price is $149.84 per acre.

Furthermore, the district court had before it evidence concerning the issue of the value of the four-acre tract. In addition to the testimony from the Lockens and their neighboring landowners, admitted over Berry-Iverson's objection, there was evidence that the land is underlaid with electrical wires; that it is lowland; that it abuts a paved highway; and that it lies in an area near Oakes which may be used for commercial enterprises in the near future. The decision of the district court, based on conflicting evidence, relating to such a factual determination of the price to be paid will not be set aside by this Court unless clearly erroneous. Rule 52(a), N.D.R.Civ.P.; *Eakman v. Robb,* Syll. ¶¶ 4, 5, *supra.* Furthermore, in *Eakman,* we held, in paragraph 3 of the syllabus, that:

> "3. In determining the sufficiency of the evidence to sustain the trial court's findings, the evidence must be viewed in the light most favorable to the findings and the trial court's findings are given the same weight as a jury verdict." 237 N.W.2d at 424.

In viewing the evidence in the instant case in the light most favorable to the judgment, we conclude that the district court's determination that Berry-Iverson should be permitted to exercise its option at a price of $149.84 per acre is not clearly erroneous.

The judgment of the district court is therefore affirmed.

ERICKSTAD, C. J., and PEDERSON, SAND and VOGEL, JJ., concur.